Ingrid CROCE, Individually, as heir of the Estate of James Joseph Croce, also known as Jim Croce, and as Guardian of Adrian Croce, Minor, Plaintiff,

v.

Philip S. KURNIT; Thomas R. Picardo, Jr., a/k/a Tommy West; Dennis Minogue, a/k/a Terry Cashman; Cashman, Pistilli & West; Blendingwell Music, Inc.; Cashwest Productions, Inc.; and Lifesong Records, Inc., Defendants.

v.

TIME IN A BOTTLE, INC., Additional Defendant on Counterclaims.

No. 78 Civ. 3340 (RWS).

United States District Court, S.D. New York.

Sept. 30, 1982.

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff; Louis C. Lustenberger, Jr., Howard R. Reiss, Joseph L. Clasen, III, New York City, of counsel.

Goldschmidt, Fredericks & Oshatz, New York City, for defendants; Barry I. Fredericks, New York City, of counsel.

## OPINION

SWEET, District Judge.

This diversity action, a portion of which was tried to the court, presented facts which evoked memories of "A Star Is Born," except that the star in this case, James Croce, died all too soon after his ascendancy. The complaint filed by Ingrid Croce, his widow and heir ("Mrs. Croce"), a California resident, sought to obtain certain damages from the defendants, citizens of states other than California, arising out of an alleged breach of certain contracts as well as rescission of the contracts on the ground of fraud, and breach of fiduciary duty. On the findings and conclusions set forth below, judgment will be granted to the defendants dismissing the claims of unconscionability and breach of fiduciary duty against Cashman and West and granting Croce's breach of fiduciary claim against Kurnit. The defendants' motion for judgment notwithstanding the verdict is denied.

### Prior Proceedings

This action was filed by Mrs. Croce on July 21, 1978 against Philip Kurnit ("Kurnit"), a New Jersey resident and a member of the bars of New York, New Jersey and California, Thomas R. Picardo, a New York

resident, also known as Tommy West ("West"), Dennis Minogue, also known as Terry Cashman ("Cashman"), a New Jersey resident, Cashman, Pistilli & West ("CP & W"), a New York partnership, Blendingwell Music, Inc. ("Blendingwell"), a New York Corporation, Cashwest Productions, Inc. ("Cashwest"), a New York corporation and Lifesong Records, Inc. ("Lifesong"), a New York corporation and a subsidiary of Blendingwell. Kurnit, West and Cashman are officers of Blendingwell, Cashwest and Lifesong. The complaint set forth nine counts containing causes of action for breach of fiduciary duty (Count 1), fraud (Count 2), unconscionability (Count 3), breach of contracts (Counts 4, 5 and 6), replevin (Count 7), conversion (Count 8) and breach of fiduciary duty (Count 9).

The action was initially assigned to Honorable Thomas P. Griesa and subsequently reassigned to the Honorable Abraham Sofaer, both of whom recused themselves, and then to the Honorable Lawrence Pierce. Upon Judge Pierce's elevation to the Second Circuit, the case was then reassigned to this court. Magistrate Sinclair supervised discovery which turned out to be a difficult and arduous task.

Two motions for summary judgment were made and denied, one by Judge Sofaer on August 1, 1979 and one by this court on May 20, 1982. In addition various discovery and pretrial motions were made, and at the request of the defendants the court directed by its opinion of May 20, 1982 that the trial be bifurcated, that the contract issues, Counts 4, 5, 6, 7 and 8, be tried first, to be followed by the trial of Counts 1, 2, 3 and 9.

From June 3, 1982 to June 24, 1982 the contract and conversion issues were tried to a jury which rendered a special verdict[1] and certain other claims were decided by the court as a matter of law. On June 28, 1982, Mrs. Croce stipulated to the withdrawal of her claim for replevin, waived the

1. The special verdict read as follows:

Verdict

1. How much does Cashwest Productions, Inc. ("Cashwest") owe Mrs. Croce for royalty payments from ABC's sales in Canada?
   $34,864 or $29,075?

   $34,864.

2. Did Cashwest properly account to Mrs. Croce for estate royalties due on the moneys received from ABC in settlement of the Cashwest claims against ABC?

   Yes    No
   X

   If so, what was the amount not properly accounted for?

   _____

3. Did ABC reduce its royalty payments to Cashwest as a consequence of the settlement of the Blendingwell claim against ABC?

   Yes    No
   X

4. Did Cashwest fail to account to Mrs. Croce for unreported sales of records by Lifesong?

   Yes    No
          X

Verdict

If so, what amount should have been accounted?

_____

5. Was 17½% the customary Lifesong fee as a packaging expense as a deduction from royalties in 1975?

   Yes    No
   X

   If not, what deduction, if any, was Cashwest entitled to make royalty payments to Mrs. Croce?

   _____

6. Was the $225,000 paid by ABC in October 1974 an advance against an anticipated settlement with ABC or an advance against royalties subsequently recouped by ABC?

   Advance against royalties subsequently recouped.

7. Did Cashwest use the Estate Sides without a contract with Mrs. Croce?

   Yes    No
          X

jury and stipulated to a dismissal of Count 2. From June 28, 1982 to July 1, 1982 the remaining Counts, 1, 3 and 9, claiming fraud, unconscionability and breach of fiduciary duty were tried to the court. It is upon the entire record that the following findings of fact and conclusions of law rest.

### Findings of Fact

James Joseph Croce ("Jim Croce") was born in 1943 and in the course of his schooling attended Villanova University. There he met Ingrid, who subsequently became his wife, and also Tommy West, who became both his friend and, as it developed, a business associate. During the college years Jim Croce sang, played guitar and wrote songs, as did West.

After graduation from college, Jim Croce sought to shape a career out of his interest in music, played and sang in coffee houses, and developed both his own style and his own music. He managed to produce a record album entitled *Facets* containing certain of his songs which he performed. He sent the album to Tommy and sought to interest the latter in his work.

West in the meantime also developed a career in music, producing, singing and playing for commercials. He had met Cashman with whom he collaborated as well as Kurnit, an attorney who had been working at ABC Records, Inc. By 1968 all three, West, Cashman and Kurnit were at CBS, Cashman, West in the music department and Kurnit serving in the legal department. The two musicians together with Eugene Pistilli ("Pistilli") decided to enter the record business on their own and set up CP & W for that purpose. Kurnit was also a participant in the enterprise.

In the summer of 1968, while Kurnit was still at CBS, Jim and Ingrid Croce arrived in New York, stayed with West, and met Kurnit, who was introduced to them as "the lawyer." West and the Croces discussed the possibility of CP & W producing a record by Jim Croce. The outlines of the contractual arrangements were discussed, the Croces returned to Pennsylvania and according to West, proposed contracts were taken to them after their trip to New York

and before their return to New York on September 17, 1968. Whether or not that occurred (Mrs. Croce maintains it did not), the Croces did not conduct any meaningful review of the contract until September 17, 1968.

On that date the Croces were in New York again, staying with the Wests. They met Kurnit for the second time. He outlined the contract terms to them in a two to three hour meeting. According to Kurnit, there was no negotiation although a minor change in the proposed contract was made. The Croces signed three agreements, a recording contract with CP & W, a publishing contract with Blendingwell and a personal management contract also with Blendingwell ("the contracts"). The Croces were unrepresented, and they were not advised to obtain counsel by Kurnit who signed the contracts on behalf of the corporate entities. Kurnit was known to the Croces to be a participant with Cashman, Pistilli and West in their enterprises. The Croces did not enter into any retainer agreement with Kurnit, were never billed by him in connection with the contracts, and aside from the meeting of September 17, received no advice from him concerning the contracts.

The contracts that were executed on September 17, 1968 provided that Croce would perform and record exclusively for CP & W, as well as the terms under which all the Croce's songs would be published and managerial services would be provided for the Croces. The contracts placed no affirmative requirements on the defendants other than to pay each of the Croces approximately $600 a year and to make certain royalty payments in the event that music or records were sold. The duration of the contracts was seven years if options to extend were exercised by the defendants. All rights to the Croces' musical performances and writings were granted to the defendants. The management contract was assignable.

The expert testimony offered by Mrs. Croce focused on the effect of the assignability of the management contract, the lack of any objective threshold to be achieved before the exercise of options, and the in-

terrelationship of the three contracts. In addition other significant provisions were cited as being unfavorable to the Croces which would have been the subject of negotiation had the Croces in September, 1968 been represented by the expert retained in 1982. These included the term of the contracts, the royalty rate and its escalation, a revision of the copyrights, a minimum recording sides obligation, and the time for making objections to royalty statements.

However, certain of the provisions which were under attack were also contained in the forms published by various organizations involved in the entertainment industry, and there was no evidence presented in this action, meticulously prepared by able counsel on both sides, which established that the terms of these contracts differed significantly from others prepared by Kurnit on behalf of the defendants. These contracts include many terms of art and are customarily the subject of hard bargaining in the event that the artist and the producer both have established economic power. Here, however, no significant changes were made in the contracts as initially proposed by Kurnit on behalf of the other defendants.

After the contracts were executed, the parties undertook their performance. In the summer of 1969 the recording contract was assigned to Interrobang Productions, Inc. ("Interrobang"), as was the management contract a year later. Cashwest is the successor in interest to Interrobang. The management contract was assigned to Showcase Management, a company in which CP & W had an interest, a demonstration record was prepared (a "demo") and thereafter Capital Records undertook to produce a Croce recording under the direction of Nick Vanet. This recording was published in the spring of 1969 and after its publication, Jim Croce worked hard to promote it. By the winter of 1969–70 it was apparent the album was a failure, and Jim turned to other pursuits.

In the fall of 1968 Kurnit represented the Croces in connection with a lease. In April, 1969 Kurnit listed his firm as the party to whom all ASCAP correspondence for Croce should be sent. In January, 1970 Kurnit executed a document as attorney in fact for the Croces and also was involved in the dispute between the Croces and their then manager.

Notwithstanding, on March 19, 1970 Jim and Ingrid, unhappy with the management with which they had been provided, sought legal advice with respect to breaking the contracts. They retained Robert Cushman ("Cushman") of Pepper, Hamilton & Schatz in Philadelphia. On June 9, 1970 Croce wrote to Kurnit seeking to terminate the contracts and advising him that "Ingrid and I are getting out of music." In the summer of 1970, Cushman met with Kurnit and discussed the grievances which the Croces had expressed to him, supported at one point by a statement of Pistilli which, according to Cushman, established that the Croces had been defrauded. Some revisions and amendments to the contracts were discussed.

In December 1970 Ingrid became pregnant, and Jim returned to songwriting and performing. Thereafter, he sent material to West who expressed interest and delight. Cushman requested a further retainer to pursue the revision or cancellation of the contracts and never heard again from either of the Croces.

In the early part of 1971 West and Cashman worked with Croce and prepared a demo. With Kurnit's help, they sold the idea of its production to ABC, interested an established management agency in Croce with the result that Interrobang delegated its management contract for Croce to BNB Associates, Ltd. ("BNB") in September 1971. Once the relationship with the defendants resumed in 1971, Kurnit represented the Croces on various matters. After the summer of 1971 and the birth of his son in September, Jim's career began to move. His work was well received and in April 1972, ABC records contracted to manufacture, distribute and sell Croce records. Jim was on the road late in 1971 and 1972 promoting and performing. His career skyrocketed and until September 20, 1973 the future appeared halcyon for all concerned. During 1972 Kurnit represented Croce on matters other than the contracts.

On September 20, 1973, after a concert in Louisiana, Croce took off in a private plane. The plane crashed in a thunderstorm, and Croce was killed.

Very shortly thereafter Kurnit visited Mrs. Croce and offered to represent the estate and to take care of the wrongful death action arising from the crash. On September 26, 1973, Kurnit became the attorney for the Estate and Mrs. Croce. In connection with the wrongful death action, Kurnit later stated on the form filed with the Appellate Division on October 4, 1973:

"Ingrid Croce, and her deceased husband, James J. Croce, have been my clients since 1968. I have been their personal attorney in a majority of their legal matters."

Kurnit served as counsel to the estate from September 26, 1973 until June 24, 1976. During the spring of 1976 Kurnit, on behalf of the defendants, had consulted Donnenfeld and Brent, a Los Angeles law firm, with respect to a movie proposal. Thereafter, at his request on June 24, 1976 that firm was substituted for him as counsel for the estate.

In 1975, Mrs. Croce remarried and in the company of her husband discussed with Kurnit the use of certain material which had not been the subject of the contracts. These discussions, involving what the parties have termed "the estate sides," were the subject of the contract issues concerning the publication of "The Faces I Have Been" album resolved by the jury's Special Verdict. During these discussions Kurnit represented CP & W and after the initial discussion, Mrs. Croce retained Ivan Hoffman, an attorney, to represent her. Hoffman and Kurnit exchanged correspondence, drafts and telephone calls. There is no evidence that Hoffman was consulted about the contracts or Mrs. Croce's rights which resulted from the contracts.

However, in November 1975 Mrs. Croce retained Howard Thaler to represent her on a number of matters unrelated to the contracts. At his deposition, Thaler invoked the attorney/client privilege when questioned about his discussions with Mrs. Croce about the contracts. Thaler's invocation of the privilege may imply that Thaler has information against Mrs. Croce's interests in this action. However, even assuming that this inference is permitted, Kurnit has failed to establish the date on which Mrs. Croce conferred with Thaler concerning the contracts prior to June 10, 1976.[2]

On that day Thaler met with Donnenfeld and some discussion was had concerning Mrs. Croce's rights under the contracts. Mrs. Croce was advised that since the Estate had been referred to them by Kurnit, a conflict of interest existed which precluded their initiating any claim against Kurnit. It was pointed out, however, that since the Estate was shortly to be terminated, Mrs. Croce would thereafter initiate any action she felt appropriate. Obviously these issues had been discussed between Mrs. Croce and Thaler prior to June 10, 1976 but Kurnit has not sustained his burden of proof to establish an earlier date to end the toll of the statute of limitations as discussed below.

The Estate was closed on September 27, 1977 and this action was initiated on July 21, 1978.

During the period from 1968 to date the defendants received approximately $6.9 million as a consequence of the performance of the contracts. The recording and entertainment career of Croce is not atypical, representing as it does, initially a famine, and ultimately a feast. No expert who testified claimed the prescience to determine in advance what records the public will buy or in what amount. Though the returns on a successful record are unbelievably high, the risk of initial failure is also high. Judgment, taste, skill and luck far outweigh the time spent or the capital expended on any particular recording.

It is on these facts that Mrs. Croce's claims of unconscionability and breach of

2. Kurnit offered into evidence a summons and complaint by Thaler against Mrs. Croce, which was admitted pursuant to Fed.R.Evid. 803(8). Attached to this exhibit was a schedule of dates and services purporting to reflect Thaler's representation of Mrs. Croce. The schedule is hearsay and cannot be admitted as evidence of the truth of the dates and services performed by Thaler.

fiduciary duty, must be resolved, as well as the defendants' affirmative defenses of the statute of limitations and election of remedies. The claim of fraud has not been pressed by Mrs. Croce, and indeed there is no proof of misrepresentation, falsity or reliance except in connection with the fiduciary duty claims.

## 1. *Representation by Kurnit*

The claims of breach of fiduciary duty and procedural unconscionability are based on the role and actions of Kurnit at the signing and during the performance of the contracts. Indeed, the nature of Kurnit's relationship with the Croces determines whether this action is barred by the statute of limitations. Therefore, this court will assess the September 17, 1968 transaction before proceeding to the merits of each claim.

Mrs. Croce asserts that after Kurnit had been introduced to the Croces on a prior occasion as "the lawyer," Kurnit acted as the Croces' attorney at the signing of the contracts or in such a manner as to lead the Croces to reasonably believe that they could rely on his advice. The Croces were aware of the fact that Kurnit was an officer, director and shareholder of Blendingwell and Cashwest on whose behalf Kurnit signed the contracts.

██ In light of the facts set forth above, Kurnit did not act as the Croces' attorney at the signing of the contracts. Even in the absence of an express attorney-client relationship, however, a lawyer may owe a fiduciary obligation to persons with whom he deals. *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Nichols v. Village Voice, Inc.,* 99 Misc.2d 822, 417 N.Y.

S.2d 415, 418 (Sup.Ct.1979). In particular, a fiduciary duty arises when a lawyer deals with persons who, although not strictly his clients, he has or should have reason to believe rely on him. *In re Goldberg,* 12 B.R. 180, 183 (Bkrtcy.D.N.J.1981); *Schwartz v. Greenfield, Stein & Weisinger,* 90 Misc.2d 882, 396 N.Y.S.2d 582, 584 (Sup. Ct.1977); H. Drinker, *Legal Ethics,* 92 (1953). Kurnit's introduction as "the lawyer," his explanation to the Croces of the "legal ramifications" of the contracts which contained a number of legal terms and concepts, his interest as a principal in the transactions, his failure to advise the Croces to obtain outside counsel, and the Croces lack of independent representation taken together establish both a fiduciary duty on the part of Kurnit and a breach of that duty.

In *Howard v. Murray,* 43 N.Y.2d 417, 372 N.E.2d 568, 401 N.Y.S.2d 781 (1977), an action to rescind a mortgage, bond and option arrangement, an attorney-client relationship had existed between the parties before the attorney became a principal in the transaction. The court concluded that any doubt as to whether an attorney-client relationship existed at the time of the transaction "should readily have been resolved against the defendant, absent proof of a clear and forthright statement to his clients that he was no longer their attorney and that they should obtain outside counsel before continuing any negotiations." *Id.* at 422, 372 N.E.2d at 570, 401 N.Y.S.2d at 784. Although I conclude that Kurnit did not act as counsel to the Croces before September, 1968, the events surrounding the execution of the contracts, in particular his failure to advise the Croces to obtain counsel, establish the applicability of *Howard v. Murray* in determining the obligations of Kurnit.[3]

---

**3.** *See Model Code of Professional Responsibility* DR 7–104(A)(2) (1979)

During the course of his representation of a client a lawyer shall not:

.    .    .    .    .

Give advise to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client. (citations omitted). *See also Model Rules of*

*Professional Conduct* Rule 4.3 comment at 167 (Proposed Final Draft May 1981):

[N]o misconduct is present where a lawyer provides an accurate statement of the law, or prepares papers for settlement or trial, so long as it is made clear that the lawyer does not act as counsel for the unrepresented person or otherwise purport to advance the latter's interests.

(citations omitted); *W.T. Grant Co. v. Haines,* 531 F.2d 671 (2d Cir.1976).

Moreover, the limits of the fiduciary relationship as defined in *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900 (2d Dep't. 1976) apply. The court there realized that the

exact limits of such a relationship are impossible of statement (see Bogert, Trusts & Trustees [2d ed.], § 481). Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

383 N.Y.S.2d at 904–95. (citations omitted).

This definition of a fiduciary duty applies not only to Kurnit's relationship but also on the facts of this case to West and Cashman, in whom the Croces placed their trust. Before further addressing Mrs. Croce's breach of fiduciary duty allegations, however, the defendants' statute of limitations defense warrants examination. For these purposes, Kurnit's relationship with the Croces controls.

### 2. *Statute of Limitations*

▉ The applicable statute of limitations is six years for fraud and breach of fiduciary duty. N.Y.Civ.Prac. § 213(1) & (2) (McKinney). To avoid the time bar, Mrs. Croce asserts that Kurnit's continuous representation of the Croces from September 17, 1968 to June 24, 1976 tolls the statute under the "continuous representation" doctrine set forth in *Greene v. Greene,* 56 N.Y.2d 86, 436 N.E.2d 496, 451 N.Y.S.2d 46 (1982). In that case, the New York Court of Appeals held that for statute of limitations purposes a cause of action against an attorney for acts arising out of the attorney's representation of the plaintiff does not accrue during the period of that representation. This principle was originally recognized in New York in medical malpractice cases, *see Borgia v. City of New York,* 12 N.Y.2d 151, 187 N.E.2d 777, 237 N.Y.S.2d 319 (1962), but has been held applicable to

actions against lawyers. *See e.g., Gilbert Properties, Inc. v. Millstein,* 33 N.Y.2d 857, 307 N.E.2d 257, 352 N.Y.S.2d 198 (1973).

Although this court has determined that Kurnit did not act as the Croces' attorney at the signing of the contracts, he did thereafter serve as their attorney in related and unrelated matters. Indeed, in the retainer statement dated October 4, 1973, to the Judicial Conference of the State of New York referred to above, Kurnit himself stated that his representation commenced in 1968, after the execution of the contracts on September 18.

A lawyer's "various activities on [a client's] behalf can be seen as part of a course of continuous representation concerning the same or related problem." *Greene v. Greene,* 56 N.Y.2d 86, 95, 436 N.E.2d 496, 451 N.Y.S.2d 46 (1982); *see Borgia v. City of New York,* 12 N.Y.2d 151, 187 N.E.2d 777, 237 N.Y.S.2d 319, 321–22 (1962). Although representing the Croces in a lease dispute is not related to the contracts, the representation of the Croces by Kurnit stems from their relationship arising from the contracts. Moreover, Kurnit's listing on the ASCAP application, his correspondence signed as "attorney-in-fact" regarding the songwriting contract and his assistance in resolving claims with the Croce's then-manager indicate continuous representation concerning the performance of the contracts. Kurnit's representation of the Croces on unrelated matters emphasizes the trust and reliance that the Croces placed in Kurnit as their attorney. Consequently, I conclude that Kurnit's representation to the New York Judicial Conference sets the date for the beginning of the tolling period as September 18, 1968.

Kurnit asserts, however, that Jim Croce's consultation of Cushman on March 19, 1970 ends the toll. The rationale for the continuous treatment doctrine lends credence to this assertion. Because a "relationship between the parties is marked by trust and confidence, ... [because] there is presented an aspect of the relationship not sporadic but developing; ... [and because] the recipient of the service is necessarily at a disadvantage to question the reason for the

tactics employed or the manner in which the tactics are executed," the continuous treatment doctrine was extended to continuous representation. *Siegel v. Kranis,* 29 A.D.2d 477, 288 N.Y.S.2d 831, 834 (2d Dep't. 1968). However, Jim Croce's retention of Cushman in 1970 to attempt to terminate the contracts also terminated the continuing representation by Kurnit.

Mrs. Croce argues that any interruption of the toll by the retention of Cushman should end by December of 1970 when Jim Croce decided to work pursuant to the contracts and discontinued any relationship with Cushman. However, once Jim Croce consulted Cushman, he was no longer the disadvantaged client unable to question or to pursue remedies for perceived wrongs. He inquired of his rights to terminate the contract and chose not to exercise them. Hence, I conclude that the statute of limitations began to run on March 19, 1970 and continued to run for three and one half years until Kurnit was appointed to represent the Estate of Jim Croce.

Nonetheless, once Jim Croce died, his Estate had the right to pursue whatever causes of action survived his death. By the September 26, 1973 appointment of Kurnit as counsel to the Estate, the relationship between the Estate and Kurnit was marked by confidence and trust, once again placing Kurnit in a fiduciary relationship and making the continuing representation doctrine applicable as to the Estate.

Moreover, in *Pet, Inc. v. Lustig,* 77 A.D.2d 455, 433 N.Y.S.2d 934, 935–36 (4th Dep't 1980), the court held that it "would not permit the statute of limitations to run where the one claiming the benefit of the statute is the one charged in law with the duty of asserting and enforcing the claim before the statute runs." (citations omitted). In the instant case, Kurnit asserts the statute of limitations as a bar to Mrs. Croce's claims. However, once he was appointed counsel for the Estate, he had the duty of asserting claims on behalf of the Estate. Although it is understandable that Kurnit did not investigate or pursue claims against his own interest, he may not now claim the benefits of the statute of limitations.

Therefore I conclude that the statute of limitations was tolled for two years and nine months from September 26, 1973 until June, 1976 when Donnenfeld and Brent were substituted as counsel for the Estate, which coincided with the period of Mrs. Croce's consultation of Thaler concerning her rights under the contracts. Mrs. Croce argues that the toll should continue until September 27, 1977, the date on which the Estate was closed because of Donnenfeld and Brent's representation that it would not bring any action against Kurnit because of a conflict of interest. While this argument has some merit, it is immaterial. Whether the statute continues to run to June, 1976 or to September, 1977 is of no consequence, neither date would cause this action to be untimely.

The statute of limitations ran for three and one half years from March, 1970 to September, 1973 and for two years and one month from June, 1976 to July 21, 1978, the date on which this action was filed. Hence I conclude that this action is not barred by the statute of limitations.

### 3. *Unconscionability and Breach of Fiduciary Duty*

Mrs. Croce contends that the contracts were unconscionable. An unconscionable contract "affronts the sense of decency," *Gimbel Bros., Inc. v. Swift,* 62 Misc.2d 156, 307 N.Y.S.2d 952 (Civ.Ct.1970), and usually involves gross onesidedness, lack of meaningful choice and susceptible clientele. J. Calamari & J. Perillo, *Contracts* § 9–40 (2d ed. 1977). A claim of unconscionability "requires some showing of 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *State v. Avco Financial Serv.,* 50 N.Y.2d 383, 406 N.E.2d 1075, 429 N.Y.S.2d 181, 185 (1980) (*quoting Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965) ).

Additionally, Mrs. Croce alleges that defendants breached their fiduciary duty to the Croces. A fiduciary relationship is bound by a standard of fairness, good faith and loyalty. *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1078 (2d Cir.1977)

(quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978).[4]

■ Substantial testimony was adduced on the subject of the inherent conflict presented by the control of the management contract by the publisher. The management contract, of course, served only the interest of the artist, although obviously the interest of the artist and his career were inextricably interwoven with the publication and promotion of his product. For example, BWB, when undertaking the assignment to manage Croce, immediately obtained a royalty rate increase, of course, thus affecting its own compensation.

The significance of management contracts depends on the needs of artists, some of whom are entirely capable of performing all the business and promotion duties while others seek to concentrate solely on their artistic efforts. As the relationship developed, Croce depended on his manager significantly, but the conflict between the artist and the producer does not so completely overbalance the mutuality of their interest as to make management and recording contracts held or controlled by the same interests, as occurred here, in and of itself, determinative of the issues of unfairness and unconscionability. Indeed, it was Kurnit who ultimately arranged for a separate management contract, albeit that the contract with BWB barred the manager from urging the artist to terminate the contracts.[5]

As the facts stated above indicate, the contracts were hard bargains, signed by an artist without bargaining power, and favored the publishers, but as a matter of fact did not contain terms which shock the conscience or differed so grossly from industry norms as to be unconscionable by their terms. The contracts were free from fraud and although complex in nature, the provisions were not formulated so as to obfuscate or confuse the terms. Although Jim Croce might have thought that he retained the right to choose whether to exercise renewal options, this misconception does not establish that the contracts were unfair.[6] Because of the uncertainty involved in the music business and the high risk of failure of new performers, the contracts, though favoring the defendants, were not unfair. See *Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 403–04, 244 N.E.2d 685, 688, 297 N.Y.S.2d 108, 112 (1968) ("Whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract's commercial setting, purpose, and effect."). Therefore, I conclude that the terms of the contracts were neither unconscionable nor unfair and that Cashman and West did not breach a fiduciary duty.

In considering procedural unconscionability this court notes that the instant situation lacks the elements of haste and high pressure tactics, *Industralease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.,* 58 A.D.2d 482, 396 N.Y.S.2d 427, 431 n. 4 (2d Dep't 1977), and that the contracts did not provide for the sole benefit of the defendants, *Miner v. Walden,* 101 Misc.2d 814, 422 N.Y.S.2d 335, 338 (Sup.Ct. 1979). Indeed, they benefitted the Croces by millions of dollars. Thus Kurnit's actions do not rise to the level of procedural unconscionability. Kurnit, however, as a lawyer and principal, failed to advise the Croces to retain independent counsel and proceeded to give legal advice to the Croces in explaining the contracts to them. These actions, as discussed above, constitute a breach of the fiduciary duty Kurnit owed the Croces. *See Howard v. Murray,* 43

---

4. Mrs. Croce, relying on her contention that Kurnit was the Croces' lawyer at the signing of the contracts, cites the standard to which attorneys are held when entering into transactions with clients. *Greene v. Greene,* 56 N.Y.2d 86, 92, 436 N.E.2d 496, 451 N.Y.S.2d 46 (1982). However, because this court has determined that Kurnit was not acting as the Croces' lawyer, this standard does not apply.

5. The experts testifying on this subject were all eminent and well qualified. Allan Arrow, Esq. was particularly forthright, credible and helpful to the court in reaching the findings just reported.

6. Rather such misconception is relevant to claims of procedural unconscionability.

N.Y.2d 417, 372 N.E.2d 568, 401 N.Y.S.2d 781, 784 (1977).[7]

### 3. Remedy

Mrs. Croce seeks rescission of the contracts or more specifically termination of the contracts on the date of judgment. Since Mrs. Croce sued for breach of contract in Counts 4, 5 and 6, defendants assert that she is barred from seeking rescission because of the doctrine of election of remedies, which prevents a party who pursued two inconsistent theories from obtaining duplicative relief.

■ Under New York law a party must elect between an action in equity for rescission of the contract and an action at law for damages. *See Omega Executive Services, Inc. v. Grant,* Fed.Sec.L.Rep. (CCH) ¶ 97,623 (S.D.N.Y.1980) and cases cited therein. Election is to be made after trial. *Id.* at 3–4.

■ Although the doctrine of election of remedies does not preclude rescission, I find that rescission is inappropriate on the facts of this case. The Second Circuit has recognized that rescission is an extraordinary remedy, *Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980), which is granted

> only where the breach is found to be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Callanan v. Powers,* 199 N.Y. 268, 284, 92 N.E. 747, 752 (1910). *See Nolan v. Sam Fox Pub. Co.,* 499 F.2d 1394 (2d Cir.1974). Rescission is not appropriate where the failure "was not a breach going to the root of the contract," *Direction Associates, Inc. v. Programming and Systems, Inc.,* 412 F.Supp. 714, 719 (S.D.N.Y.1976); *see also Schwartz v. National Computer Corp.,* 42 App.Div.2d 123, 345 N.Y.S.2d 579 (1973).

*Id.* The breach of fiduciary duty by Kurnit is not so fundamental as to defeat the intent or purpose of the contract.

Moreover, the contracts have been performed. In attempting to return to the status quo Mrs. Croce would have the defendants retain the money they received under the contracts as compensation for their services and return the master tapes and copyrights to her. Defendants oppose this remedy as unjust enrichment. Although this court has difficulty perceiving how the status quo ante could ever be determined, achieving this possibility does not make rescission appropriate when, as in the instant case, the breach of fiduciary duty is not a breach going to the root of the contract.

■ Mrs. Croce is, however, entitled to damages resulting from Kurnit's breach of fiduciary duty in failing to advise the Croces to seek independent counsel. *See supra,* text at n. 3. Given the bifurcated nature of this lawsuit, and the fact that, but for Kurnit's breach, the second branch of Mrs. Croce's complaint, claiming fraud, unconscionability, and breach of fiduciary duty, would in all likelihood not have arisen, this court assesses Mrs. Croce's damages to be the costs and attorneys' fees expended in prosecuting those claims, and determines that Kurnit is liable for this amount.

■ Finally, with regard to the contract claims, defendants move for judgment notwithstanding the verdict or reconsideration of this court's directed verdict in favor of Mrs. Croce on Blendingwell's counterclaim and Mrs. Croce's claim concerning songwriter's royalties with regard to ABC/Blendingwell. Neither party disputes the propriety of directing a verdict with respect to these particular contested claims, though obviously defendants argue that the court's conclusions previously expressed were in error. Notwithstanding, defendants' motions are denied.

Pursuant to the songwriting agreement with Blendingwell, both Jim Croce and Blendingwell were entitled to 50% of the

---

**7.** Retention of independent counsel by the Croces, had they chosen to do so, might well have resulted in terms more advantageous to them. Although they never pursued, the brief negotiations entered into by Cushman in 1970 on the Croces' behalf, seeking revisions and amendments to the contracts, evidence this fact. Kurnit's failure to advise the Croces of the advantage of independent representation, coupled with his introduction to them as "the lawyer," his explanation of contracts to them and his interests in the venture warrant a finding of breach of fiduciary duty.

royalties resulting from sales of albums. On April 25, 1972, Blendingwell assigned half of its share to Wingate Music Corp. ("Wingate"), an affiliate of ABC. Blendingwell contends that it was only obligated to pay Jim Croce 50% of the 75% that it had actually received from ABC. However, from 1972 until the date of this lawsuit Blendingwell paid Jim Croce and his estate 50% of the 100% of the royalties owed by ABC. Blendingwell asserted a counterclaim to recover $334,024, the difference between 50% of 75% (37½%) and 50% of 100% (50%). Based on the wording of the Wingate agreement, Kurnit's admission that the Wingate agreement did not affect the Croce share and the authority of *Nolan v. Sam Fox Publishing Co.,* 499 F.2d 1394, 1399 (2d Cir.1974), this court concludes that its decision on the direct verdict should stand.

Defendants also move for reconsideration of the court's denial of a directed verdict with respect to Mrs. Croce's claim for royalties relating to the settlement of the ABC litigation which offset a debt owed by Blendingwell to ABC against royalties owed by ABC to Cashwest. Alternatively defendants seek a determination that the jury's verdict against the defendants be limited to ⅝ths of $103,114.

A motion for reconsideration must be filed within ten days. The defendants submitted their motion on September 8, 1982. Thus it is untimely. Local Rule of Court, Civil Rule 3(j).

The defendants moved for a directed verdict prior to the jury's verdict on June 24, 1982. This motion was denied. After the jury's verdict was announced, the defendants orally moved for judgment notwithstanding the verdict and for a limitation of liability on this issue to ⅝ths of $103,114. These motions are denied.

Pursuant to Rule 50(a) and (b) Fed.R. Civ.P. a motion for judgment notwithstanding the verdict must be made within ten days to have the verdict set aside. The defendants' written submission is therefore untimely whether the requested relief is reconsideration or judgment notwithstanding the verdict.

Further defendants do not submit any additional information which was not before this court when I denied the oral motions for judgment notwithstanding the verdict and for limitation of the jury's verdict. Consequently, the motions are denied even if the time limits described above are disregarded.

Submit judgment on notice in ten (10) days.

IT IS SO ORDERED.