**Robert VARNBERG and Gail Varnberg, Plaintiffs,**

v.

**F. Wendell MINNICK, Minnick Resources, Inc., Paul L. Hayes, Jr., Hayes Resources, Inc., Martin J. Oppenheimer, James M. Connors and Connors Investors Services, Inc., Defendants.**

No. 83 Civ. 4577 (RPP).

United States District Court, S.D. New York.

March 13, 1991.

Wormser, Kiely, Galef & Jacobs, New York City by John T. Morin, for plaintiffs.

Pollack & Greene, New York City by Alan M. Pollack, for Connors Investor Services, Inc. and James M. Connors.

Shapiro Spiegel Garfunkel Rubin & Driggin, New York City by Edward Rubin, for F. Wendell Minnick.

## OPINION AND ORDER

Jury Trial Demanded

ROBERT P. PATTERSON, Jr., District Judge.

This is an action alleging securities fraud in violation of section 17(a) of the Securities

Act of 1933, 15 U.S.C. § 77q (1988), section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988), and Rule 10b–5 of the Securities Exchange Commission promulgated thereunder, and alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (1988), as well as various state law violations. Defendants James M. Connors ("Connors") and Connors Investor Services, Inc. ("CIS"), now move for partial summary judgment dismissing certain counts of plaintiffs' Third Amended Complaint pursuant to Fed.R. Civ.P. 56(a) and 9(b). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

### 1. The Parties

It is undisputed that in late 1976, plaintiff Gail Varnberg, a resident of New York, inherited a portfolio of stocks, bonds and cash valued at nearly $6 million as beneficiary of a trust established by her grandparents. Gail Varnberg and her husband Robert, also a New York resident, allege that in July 1977 they met defendant F. Wendell Minnick ("Minnick") of Minnick Resources, Inc. of New York. *See* Gail Varnberg Aff. ¶ 7. Plaintiffs admit that beginning in 1977 they invested in a number of venture capital and tax shelter investments promoted by Minnick. Defendants' Rule 3(g) Statement filed Sept. 22, 1989 (hereinafter "Def. Rule 3(g) Stmt.") ¶ 13; Plaintiffs' Response to Defendant's Rule 3(g) Statement filed Dec. 1, 1989 (hereinafter "Pl. Rule 3(g) Stmt.") ¶ 13.

· Defendant Martin J. Oppenheimer ("Oppenheimer") is a corporate and tax attorney retained by the Varnbergs in November 1977. Plaintiffs deny that they hired Oppenheimer as anything more than a legal advisor, *see* Pl. Rule 3(g) Stmt. ¶ 12, although defendants claim that plaintiffs hired Oppenheimer upon Minnick's recommendation to represent them in connection with investments particularly tax shelter investments they were beginning to make through Minnick and Hayes. Def. Rule 3(g) Stmt. ¶ 12.

Plaintiffs claim that beginning in 1977 they were fraudulently induced by defendants Minnick, Hayes and Oppenheimer to invest in excess of $1 million of the funds Gail Varnberg had inherited in a number of ventures, none of which plaintiffs allege ever turned a profit.

Defendant CIS is a registered investment company with its principal place of business in Pennsylvania. The parties do not dispute that on November 14, 1977 the Varnbergs signed an "Investment Management Agreement" retaining CIS to manage the portfolio of assets Gail Varnberg had inherited the previous year. Defendant James M. Connors, a registered investment advisor and resident of Pennsylvania, is president of CIS and signed the Investment Management Agreement.

Although the written agreement does not explicitly apply to investments of the type plaintiffs made through Minnick using portfolio assets, plaintiffs claim that Connors and CIS undertook to advise them with respect to all their investments.[1] To support this allegation, plaintiffs rely on a letter on CIS stationery signed by Connors which predates the written agreement and which states:

> Connors Investor Services will not manage tax shelter investments but will assist in the analysis of what amounts should be placed in such vehicles and assist in the selection of appropriate holdings.

---

**1.** It appears undisputed from the record that funds for the investments were disbursed through Connors and CIS. *See* Gail Varnberg Aff. ¶ 19(C). Connors admitted at his deposition that he was aware that plaintiffs were making the investments at issue, *id.,* Exh. F at 288, but denies that the investments were part of the portfolio under CIS' management. Connors Aff. ¶ 16–17. Plaintiffs testified at their depositions that they did not think Connors knew of the alleged falsity of Minnick's statements to plaintiffs. Pollack Aff., Exh. 16 at 281 (Robert Varnberg Dep.); *Id.,* Exh. 15 at 208 (Gail Varnberg Dep.). Robert Varnberg also admitted never having sent copies of reports he received regarding the various ventures to Connors. *Id.,* Exh. 6 at 62 (Robert Varnberg Dep.).

Pollack Aff., Exh. 44 (Letter from CIS to the Varnbergs dated November 11, 1977). Connors and CIS disclaim any such duties, pointing out that by its terms the November 14, 1977 Investment Management Agreement did not address tax shelter investments.[2] *See* Pollack Aff., Exh. 1; Connors Aff. ¶ 17. CIS's primary activities in managing the Varnbergs' portfolio are reflected in 21 quarterly valuation statements mailed to the Varnbergs[3] between March 6, 1978 and May 17, 1983.[4] Those statements on their face make no mention of any of the allegedly fraudulent investments forming the basis of this action. None of the individual statements evaluate the performance of any tax shelter investment.

Gail Varnberg claims that she formed a separate oral agreement with Connors individually on or about November 14, 1977 retaining him as her personal investment advisor and analyst. Gail Varnberg Aff. ¶ 16. She relies at least in part on the existence and contents of an unsigned document entitled, "Gail Varnberg/Suggested Basic Investment Strategy/October 31, 1977" which she alleges was written by Connors and which mentions the selection of investments for the purpose of "sheltering of taxable income." Gail Varnberg Aff., Exh. B. No written agreement retaining Connors as Gail Varnberg's personal advisor existed until April 28, 1979 when the two executed a letter agreement.[5] Pollack Aff., Exh. 3. Connors denies making any oral agreement with Gail Varnberg prior to April 28, 1979 and the parties dispute the meaning of Connors' written agreement.

Plaintiffs allege that the aforementioned agreements, taken as a whole, created a duty on the part of Connors and CIS to investigate all the investments plaintiffs were making and that because Connors and CIS breached that duty, plaintiffs lost in excess of $1 million.

2. The Investments

It is undisputed that the Varnberg portfolio had a market value of approximately $4,925,683 when CIS was retained in 1977. Gail Varnberg added $960,056 in assets to the portfolio in 1978. Connors and CIS contend, although plaintiffs deny, that from November 1977 until CIS was discharged in June 1983, the Varnbergs' portfolio increased in value by $2,965,166. Connors Aff. ¶ 11. The Varnbergs admit, at paragraph 11 of their response to defendants' Rule 3(g) statement, that between 1978 and 1983 they withdrew $6,071,378 in assets from the portfolio held by CIS for personal use and for certain investment expenditures which are the subject of this action. The investments, described more fully below, can be identified under the following general headings: (1) Jasper

---

2. The agreement provided:

> The Investor ... hereby authorizes and directs the Manager to manage all such property for the account of the Investor and deal with such property for the account of the Investor as the Manager deems advisable in its sole and exclusive discretion, but only with forms of investment as described herein.

Pollack Aff., Exh. 1. The agreement authorized investments in U.S. Government securities, certificates of deposit, certain mutual funds, municipal bonds, preferred and common stock and publicly-traded stock options. *Id.*

3. Plaintiffs admit that Connors, as CIS's representative, conducted frequent telephone meetings with plaintiffs and mailed them quarterly valuation statements for the portfolio. Def. Rule 3(g) Stmt. ¶ 8; Pl. Rule 3(g) Stmt. ¶ 8; Gail Varnberg Aff. ¶ 49. Intrastate telephone calls and any type of mailing using the U.S. Postal Service constitute sufficient use of an instrumentality of interstate commerce to create jurisdiction under section 10 of the '34 Act. *See*

*Rodriguez Cadiz v. Mercado Jimenez*, 579 F.Supp. 1176, 1182 (D.P.R.1983) (mail); *Schor v. Wagner*, [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,302, 1980 WL 1377 (S.D.N.Y. Feb. 20, 1980) (telephone calls within New York City).

4. The quarterly valuation statement for the quarter ending March 31, 1980 does not appear in the record.

5. That letter agreement also provides:

> You [Connors] shall not be liable hereunder for any action performed or omitted to be performed or for any errors in judgment in managing the Investments. You shall not be responsible for any actions in following or declining to follow your advice. However, you shall be liable for acts constituting willful misfeasance or reckless disregard of your duties as well as violations of applicable law.

Gail Varnberg Aff., Exh. D at 3.

Partners; (2) BW Partners; (3) D–M Partners; (4) Annetta Partners; (5) Texas Partners; (6) Marifarms Shrimp; (7) Interex Management; and (8) New Haven Acquirers. The identity, initial date of investment and amounts invested, except for BW Partners' investment in the "Red Shoes" venture, are not controverted. *See* Def. Rule 3(g) Stmt. ¶ 13; Pl. Rule 3(g) Stmt. ¶ 13.[6]

On November 30, 1977, plaintiffs first invested $200,000 in Jasper Partners '77 which Minnick and Hayes had represented to the Varnbergs to be an oil and gas tax shelter. The Subscription Agreement for Jasper Partners, signed by Gail and Robert Varnberg, asks, "Have you relied or will you rely on an investment advisor with respect to investing in the Partnership?"

after which there appears a handwritten "NO". Pollack Aff., Exh. 11 at 11. Plaintiffs deny that the handwriting belongs to either of them and assert that the agreement they signed was blank. Gail Varnberg Aff. ¶ 30; Robert Varnberg Aff. ¶ 17.

Sometime in 1978, Robert Varnberg and Minnick Resources, Inc. formed a general partnership in New York known as BW Partners to identify and invest in a variety of ventures involving theatrical and motion picture productions.[7] Gail Varnberg provided the necessary funding by making, between June 1978 and September 1980, 48 separate unsecured "loans" to BW Partners totalling $411,766.50. In return for her loans to the partnership, Gail Varnberg received a so-called "note"[8] from BW Part-

---

**6.** At various points in this opinion, the Court relies on documents and testimony describing these investments submitted by the parties upon the Court's request after this motion had been argued. Because plaintiffs in their submission dated November 30, 1990 relied upon deposition testimony taken of Minnick, who is a defendant in this action, the facts relied upon are deemed admitted for purposes of this motion. *See infra.*

**7.** An unsigned and undated—other than "June, 1978"—version of the partnership agreement for BW Partners appears in the record as Exhibit A to a letter brief dated Nov. 30, 1990 submitted by counsel for plaintiffs (hereinafter "Pl.Nov.Subm."). According to that document, BW Partners was to continue for ten years and:

> Partnership losses shall be borne 90% by Varnberg and 10% by Resources, provided that to the extent Partnership assets are insufficient to satisfy Partnership liabilities, such liabilities shall be shared equally by the Partners.

*Id.* ¶ 4. Minnick testified at his deposition that a partnership agreement for BW Partners was signed although he could not identify Exh. A as the version that was signed. Pl.Nov.Subm., Exh. E at 99.

**8.** That document reads:

> This note, made as of June 7, 1978, witnesseth that for value received the undersigned promises to pay upon demand to the order of Gail B. Varnberg, Bedford, New York principal sums loaned it by her, with interest from time to time at the rate of 6% per annum, computed on the basis of a year consisting of 365, or when appropriate, 366 days, payable on the first day of January, April, July and October of each year commencing January 1, 1979. The payee will fill in the amounts borrowed and the principal amounts paid on the

> reverse side hereof. At the request of the payee, the obligor will execute a promissory note or notes of similar tenor reflecting the total outstanding principal balance hereunder.
>
> The obligation hereunder shall be payable only from the assets of the payer, and to the extent such assets are insufficient to satisfy this promissory note no deficiency or other personal judgment shall be demanded or entered against the obligor, any general partners of the obligor, or any other person.
>
> This note is convertible at any time at the option of the payee into a limited Partnership interest in BW Partners, which interest shall be entitled to distributions equal to the then outstanding principal amount thereof prior to any other distributions being made and thereafter shall be entitled to 15% of the Partnership's Capital, profits and cash flow and shall bear 15% of the Partnership's losses.

Pl.Nov.Subm., Exh. B.

Following a typewritten borrowings schedule ending with an entry dated "7/12/79" is a handwritten schedule entitled "Continuation of Borrowings and Payments of Principal upon 6/7/78 Promissory Note from BW Partners to Gail Varnberg." Both are attached to the so-called note. Together these schedules list 48 separate loans ranging in amount from $250.00 to $56,750.00 made between June 7, 1978 and September 22, 1980.

Whether Gail Varnberg requested BW Partners to execute any subsequent promissory note or notes reflecting total outstanding principal balances is unclear from the record, although no other notes from BW Partners appear. The record also does not indicate whether, if at all, Gail Varnberg exercised her right of conversion under the so-called note. She did however receive a transfer of all BW assets on December 29, 1981. *See infra.*

ners payable "upon demand to the order of Gail B. Varnberg," executed on October 31, 1978 by Minnick, general partner of BW, acting for Minnick Resources, Inc., but dated June 7, 1978. *Id.*, Exh. B. The record does not indicate who drafted the note, although the initials "MJO" (apparently designating Martin J. Oppenheimer) appear alongside certain notations in the schedule of borrowings attached to the note. *Id.* Minnick admitted at his deposition that Gail Varnberg's loans, at least insofar as the money was applied toward Theatre Arts Concepts, Ample Christian Endeavors, Fuel Crisis, Rosa Company and Hot Laps, *described infra*, were never repaid to her. Pl.Nov.Subm., Exh. E at 72, 76, 79 & 97.

The individual loans to BW Partners by Gail Varnberg listed in the schedule of borrowing can be grouped as follows: (1) $26,000 in March 1978 which BW in turn loaned to an entity called "Rosa Company" [9] which presented 12 off-Broadway performances of the play "Rosa" in which Minnick's wife starred; [10] (2) approximately $15,000 in December 1978 which BW in turn loaned to an "English company" called "Ample Christian Endeavors" which was assisting farmers in Nigeria; [11] (3) $10,000 sometime in 1978 or 1979 for a "musical adaptation of the film, 'The Red Shoes'" which Minnick was planning to produce; [12] (4) $40,000 in 1979 which in turn was used by BW Partners and Minnick Resources to make a promotional film for a movie entitled, "Red Right Returning"; [13] (5) $10,000 in 1979 which BW "invested" in a company called Fuel Crisis which was developing a new fuel additive; [14] (6) $50,000 in 1979 which went to an "operation" called Theatre Arts Concepts; [15] (7) $225,000 in and after March 1978 which BW Partners advanced to a company owned by Minnick which was to produce a movie entitled "Hot Laps"; [16] and (8) $10,000 in 1978 or 1979 for "Aviation Information Services" which Minnick Testified was a "software systems, management system for executive aircraft based in Denver, Colorado." [17] The record shows that the only loan for which BW Partners procured some type of promissory note was the loan to Ample Christian Endeavors. Nov.Subm., Exh. E at 70.

In 1979, Robert and Gail Varnberg formed a partnership between themselves known as Driftwood Partners which then joined with Minnick to form D–M Partners. Def. Rule 3(g) Stmt. ¶ 13; Pl. Rule 3(g) Stmt. ¶ 13.[18] D–M Partners allegedly purchased a corporation known as Aiand International in 1979 and sold it in 1982, in connection with which plaintiffs allege they lost $60,000. Gail Varnberg Aff. ¶¶ 33–34.

On December 29, 1981 BW Partners "for the sum of $1000 ... sold, transferred and assigned ... all of the right, title and interest of the Partnership, in and to all the assets and properties of the Partnership" to Gail Varnberg. Nov.Subm., Exh. C (entitled "GENERAL CONVEYANCE, ASSIGNMENT, AND BILL OF SALE").[19] In a letter to Gail Varnberg dated December

---

**9.** The record does not indicate whether in fact Rosa Company was a corporation, partnership or other type of entity.

**10.** Pl.Nov.Subm., Exh. E at 76–79 (Minnick Dep.).

**11.** *Id.* at 69–72.

**12.** *Id.* at 86–87.

**13.** *Id.* at 84.

**14.** *Id.* at 73–76.

**15.** *Id.* at 68 & 65–68.

**16.** Oppenheimer stated in a letter to Gail Varnberg dated December 29, 1981:
　　... BW advanced a large portion of the monies that you had loaned to the partnership to a corporation named Cinema Resources Inc.,

for the purpose of producing the "Hot Laps" movie. Wendell [Minnick] owns all the stock of Cinema Resources.
Pl.Nov.Subm., Exh. D. *See also id.*, Exh. E at 91–97.

**17.** *Id.* at 86.

**18.** Robert Varnberg testified at his deposition that Driftwood was a limited partnership and that he participated in all of the partnership's transactions. Letter brief dated Dec. 10, 1990 submitted by counsel for defendants (hereinafter "Def. Dec. Subm."), Exh. A at 42–43. He further testified, however, that he was the "general partner" of Driftwood Partners. *Id.* at 46.

**19.** Attached is a typewritten "PARTIAL LIST OF ASSETS AND PROPERTIES OF BW PARTNERS" which lists the following assets and properties as "carried upon the books of the BW

29, 1981—apparently the cover letter submitting the conveyance to Gail Varnberg for her signature—Oppenheimer stated:

... [T]he time has come to claim the tax benefits resulting from the loans that you have made to BW Partners.

.    .    .    .    .

The anticipated consequence [of the transfer of assets from BW Partners to Gail Varnberg] is that you will then be entitled to a bad debt deduction, treated as a 1981 capital loss, equal to the difference between the amounts you have loaned and the value of BW's assets. The Assignment sets forth that value as being $1,000, although it is possible that the IRS might claim a larger value....

Pl.Nov.Subm., Exh. D. Oppenheimer's letter continues by stating that in fact "one of the assets you will end up with may have substantial value," referring to "a corporation named Cinema Resources Inc." based on the "Hot Laps" movie. *Id.*

Apart from plaintiffs' initial investment in Jasper Partners, Gail Varnberg's loans to BW Partners, and the D–M Partners transaction, plaintiffs became involved with certain limited partnerships which Minnick and Hayes allegedly represented to be tax shelter investments. Those investments allegedly took place as follows: (1) in 1978, plaintiffs allegedly loaned $203,000 to "Annetta Partners" which allegedly then loaned $53,000 to Texas Partners, also alleged to be a tax shelter;[20] (2) also in 1978, plaintiffs allegedly formed Gailswell Corporation which between October 1978 and June 1979 invested $75,000 in Texas Partners under a subscription agreement signed by Robert Varnberg on behalf of Gailswell Corporation;[21] and (3) in 1978 or

1979, Gail Varnberg invested $76,250 in "Marifarms Shrimp" under a subscription agreement signed only by her.[22] In response to the question in the subscription agreement for Marifarms Shrimp, "Have you relied or will you rely on an investment advisor with respect to investing in the Partnership?" there appears a handwritten notation "Yes" followed by the answer "Martin Oppenheimer." Gail Varnberg claims the form was blank when she signed it and that she did not provide the handwritten responses. Gail Varnberg Aff. ¶ 30.

For each venture beginning with Jasper Partners in 1977, plaintiffs allege that Minnick represented a high probability of success and failed to disclose that there was in fact a high risk of failure of which he was allegedly aware at the time. It is undisputed that none of these ventures proved profitable and that plaintiffs and the other investing entities lost their entire investment in nearly every case.

Oppenheimer allegedly fraudulently induced plaintiffs to make two other investments, $175,000 in Interex Management in 1980[23] and $123,000 in New Haven Acquirers, a limited partnership which the Varnbergs entered in 1981.[24] Plaintiffs claim that Oppenheimer failed to disclose material facts indicating that it would be very difficult for either venture to obtain enough investors to permit plaintiffs to obtain a return of or profit on their investments. Gail Varnberg Aff. ¶¶ 35–38.

### 3. The Claims Against the Moving Defendants (Connors and CIS)

Plaintiffs charge that CIS had undertaken to assist them in analyzing the afore-

---

Partners": Ample Christian Endeavors, Aviation Information Services, Cinema Resources, Fuel Crisis and Red Right Returning (five of the entities invested in by the partnership); DM Partners—Accounts receivable, Minnick Resources, Inc. and Minnick Resources Management, Inc.—Accounts receivable; and the "Bank account of BW Partners." Pl.Nov.Subm., Exh. C at 2. No valuation appears in the schedule for any of the enumerated assets or properties.

**20.** Gail Varnberg Aff. ¶¶ 22, 25–28.

**21.** *Id.* ¶¶ 24, 30; Pollack Aff., Exh. 14.

**22.** Gail Varnberg Aff. ¶¶ 29, 31; Pollack Aff., Exh. 12. *See* Third Amended Complaint ¶ 60 (alleging a loss of only $56,250).

**23.** Defendants' Rule 3(g) Statement ¶ 14; Plaintiffs' Response ¶ 14.

**24.** *Id.* ¶¶ 15. Plaintiffs allege that Oppenheimer told them that New Haven Acquirers would purchase the New Haven Motor Inn in New Haven, Connecticut, develop the property and sell it at a profit. Gail Varnberg Aff. ¶ 37. *See* Third Amended Complaint ¶ 56.

mentioned tax shelter investments by virtue of its November 11, 1977 letter and that Connors had agreed orally in 1977, and in writing on April 28, 1979, to advise plaintiffs with respect to all of their investments. Plaintiffs contend that in each case Connors was asked to investigate the advisability of the proposed expenditure of funds but due to alleged relationships with Minnick[25] and Oppenheimer, Connors either failed to make the appropriate investigation or failed to report what he had discovered or should have discovered.[26]

Connors, on the other hand, contends that although plaintiffs were channeling portfolio profits into various ventures, these ventures were not considered part of the portfolio of assets under CIS's management. Connors also contends that he advised the Varnbergs as early as 1979 to curtail their investments in certain ventures including BW Partners but that the Varnbergs ignored his advice. Connors Aff. ¶¶ 19–20. Plaintiffs deny that Connors rendered any such advice. Gail Varnberg Aff. ¶ 53.[27] The Varnbergs continued to fund BW Partners and other ventures through cash withdrawals from their portfolio until at least 1980.

Plaintiffs commenced this action in June 1983 naming Minnick, Minnick Resources, Inc., Minnick Resources Management, Inc., Hayes, Hayes Resources, Inc. and Oppenheimer as defendants. On March 28, 1985 plaintiffs filed a Second Amended Complaint adding Connors and CIS as defendants.[28] Plaintiffs allege that Connors and CIS are liable for aiding and abetting the allegedly fraudulent activities of Minnick, Hayes and Oppenheimer by failing to make appropriate investigation of the ventures or by failing to report to the Varnbergs what they had discovered. The complaint also charges Connors and CIS with federal securities and RICO violations, breach of the 1977 and 1979 investment agreements, breach of fiduciary duty and unjust enrichment. Plaintiffs filed a Third Amended Complaint, the subject of this motion, on February 6, 1986 adding another count against defendant Oppenheimer.

Plaintiffs have obtained default judgments against Hayes and Hayes Resources, Inc. and have settled their claims against Oppenheimer.

## DISCUSSION

Summary judgment is appropriate if the evidence offered demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and the Court must view the

---

25. Plaintiffs assert that Connors was managing the portfolio of Minnick's mother at the time. Gail Varnberg Aff. ¶ 54.

26. For example, plaintiffs claim that they sought advice from Connors as to each of BW Partners' projects before Gail Varnberg made each loan and that Connors recommended or at least approved of each loan. Gail Varnberg Aff. ¶ 21; Robert Varnberg Aff. ¶ 18. Minnick testified at his deposition that he did not recall "talking very much, if at all, with Mr. Connors about the BW activities," Pl.Nov.Subm., Exh. E at 111, and that

> we may have talked about the status of investment *after it had been made,* because once a year Mr. Connors would work up some planning effort for the Varnbergs, and he would ask me a question like, "Is there going to be any income from any investments that the Varnbergs have made," and I would answer the question.

*Id.* at 106 (emphasis added).

27. The record contains at least two bills addressed to the Varnbergs for "professional services" rendered by Connors between July 1 and December 31, 1979 for "work ... related to the investment in AIAND International Corporation" and on the "Aviation Group." Gail Varnberg Aff., Exh. G. There is also a letter from Connors dated April 4, 1982 reporting sale of the AIAND interest "at a substantial profit over original cost." *Id.,* Exh. M.

28. Connors and CIS contend that the relevant date of commencement of the action as against them for statute of limitations purposes is April 11, 1985, the date on which the Second Amended Complaint was mailed to them. However, Rule 3 of the Federal Rules of Civil Procedure provides however that "[a] civil action is commenced by filing a complaint with the court."

facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). As the Supreme Court has observed, summary judgment serves the useful purpose of isolating and disposing of factually unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### 1. The Federal Claims

#### (a) *Securities Fraud*

The federal securities fraud charges against the moving defendants in the Third Amended Complaint (¶¶ 302–04) are labelled as Count 25 against Connors and as Count 2 against CIS. Each count charges these defendants with violating § 17(a) of the '33 Act and § 10(b) of the '34 Act.

##### (1) Private Right of Action under Section 17(a)

■ As an initial matter, this Court notes the growing body of precedent in this Circuit that no private right of action exists under § 17(a) of the Securities Act of 1933. *See, e.g., Seidenberg v. Drexel Assocs.*, [1990] Fed.Sec.L.Rep. (CCH) ¶ 95,477, 1990 WL 130771 (S.D.N.Y. Sept. 5, 1990); *Tobias v. First City Nat'l Bank & Trust Co.*, 709 F.Supp. 1266, 1274–76 (S.D.N.Y.1989) (collecting cases); *SSH Co. v. Shearson Lehman Bros. Inc.*, 678 F.Supp. 1055, 1058–1059 (S.D.N.Y.1987). The Second Circuit has stated that the existence of a private right of action under section 17(a) is in need of reexamination. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 174 (2d Cir.1990). Accordingly, partial summary judgment dismissing those portions of Count 25 against Connors and Count 2 against CIS which assert violations of § 17(a) is appropriate and is hereby granted as a matter of law.

##### (2) Section 10(b) Claims

Count 25 against Connors and Count 2 against CIS charge them with using manipulative and deceptive devices and with making false statements of material facts and material omissions in violation of § 10(b) of the Securities Exchange Act of 1934.

Plaintiffs' § 10(b) claim is essentially two-pronged: (1) plaintiffs allege that Connors and/or CIS orally advised them to invest in many risky ventures (i.e., beginning with Jasper Partners) without advising them of the risks, and (2) plaintiffs allege that in managing the portfolio, Connors and/or CIS advised them to engage in allegedly unsuitable option trading, failed to acquire tax free municipal bonds for Gail Varnberg's portfolio, engaged in excessive options trading and sold low-basis stock held by plaintiffs to conceal the trading losses and issued misleading quarterly valuation statements concerning plaintiffs' portfolio. Third Amended Complaint ¶ 297–98.

Defendants seek summary judgment dismissing plaintiffs' § 10(b) claims as a matter of law on three separate grounds: (1) that certain of plaintiffs' investments were not "securities" subject to the antifraud provisions of the 1934 Act; (2) that plaintiffs have failed to plead their allegations of securities fraud with particularity under Rule 9(b); and (3) that the § 10(b) claims are time-barred.

#### (a) *Meaning of the term "a security" in the 1934 Act*

As a first ground, defendants urge partial summary judgment dismissing the § 10(b) claims insofar as they are based on losses associated with BW Partners on the grounds that neither Gail Varnberg's periodic loans to the partnership nor Robert Varnberg's interest as a general partner constitutes a "security" within the meaning of § 3(a)(10) of the '34 Act. The Act provides:

(a) When used in this chapter, unless the context otherwise requires— ...

... (10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement, ..., investment contract, ... or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include cur-

rency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months ... or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (1988).

In *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), *reh'g denied,* —— U.S. ——, 110 S.Ct. 1840, 108 L.Ed.2d 968 (1990), a case involving uninsured uncollateralized demand notes issued by the Farmer's Cooperative of Arkansas and Oklahoma, the Supreme Court noted that Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* 110 S.Ct. at 949. The Court cautioned, however, that the phrase "any note" in § 3(a)(10) should not be interpreted to mean literally any note, but instead must be evaluated using the "family resemblance" test, an approach "founded on economic reality." *Id.* 110 S.Ct. at 950 & n. 2.

■ Under the family resemblance test there is a presumption that any note with a term greater than nine months is a "security." *Id.* However, the so-called note Gail Varnberg received from BW Partners was payable on demand so no such presumption applies here.

■ In this situation, the Second Circuit's approach, adopted by the Supreme Court in *Reves*, 110 S.Ct. at 951, requires that the "plain terms" of § 3(a)(10) be applied unless "the context otherwise requires." 15 U.S.C. § 78c(a) (1988). *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1137–38 (2d Cir.1976) (context required that unsecured subordinated "promissory notes" issued by brokerage firm as part of a large financing operation and payable on certain dates upon written demand be deemed "securities" subject to § 10(b)). *See also Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 938 (2d Cir.) (context required that replacement notes evidencing loans by commercial banks to finance current operations of borrower not be deemed "securities"), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).[29] A party such as Gail or Robert Varnberg asserting that a given note with a maturity of less than nine months is within the 1934 Act has the burden of demonstrating that "the context otherwise *requires." Exchange Nat'l Bank,* 544 F.2d at 1137–38 (emphasis in original).

■ Viewing the factual allegations in the light most favorable to plaintiffs, the record indicates that Minnick's purpose in giving the note to Gail Varnberg was to cover a number of loans which Mrs. Varnberg had made to BW Partners for a variety of different business ventures of the partnership. The note given to Gail Varnberg was evidently custom-drafted by Oppenheimer.[30] Although the note was convertible into a 15% interest in BW Partners, the interest rate was considerably below the rates prevailing in 1978. There is no indication in the record that a secondary market was contemplated by the parties or that notes of the type given to Gail Varnberg were offered or distributed to other investors. In view of the uniqueness of the note, offering to other investors seems highly unlikely. Even if the note was offered, the investing public would not be likely to regard it as a security since it was

---

**29.** The court in *Chemical Bank,* 726 F.2d at 938, emphasized that the analysis of context must be conducted bearing in mind the Supreme Court's statement in *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982), that:

> [W]e are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud.

and bearing in mind the Court's footnote in *Marine Bank,* 455 U.S. at 560 n. 10, 102 S.Ct. at 1225 n. 10, citing Judge Wright's concurrence in *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1260–62 (9th Cir.1976) in which Judge Wright concluded that notes evidencing commercial loans give by banks are generally not investment securities to be regulated by the federal securities laws.

**30.** Even on summary judgment, this inference is a reasonable one. Oppenheimer had drafted the partnership agreement, Pl.Nov.Subm., Exh. E at 101 (Minnick Dep.), and had approved 20 of the 48 loan disbursements under the note.

payable on demand from a closely-held partnership which Mrs. Varnberg's husband had formed with Minnick Resources and which had no apparent investment strategy.

Deferring to the economic reality implicit in these facts, it appears that the note was drafted as a means of recording open account loans made by Gail Varnberg and for tax purposes. *Cf. Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d at 942 (2d Cir.1984); *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d at 1138 (2d Cir.1976). The loans themselves are not securities and there is no allegation that Connors and CIS were instrumental, involved or that they had fiduciary duties regarding issuance of the note to Gail Varnberg. Accordingly, the Court finds that such a demand note issued by a New York partnership to a New York resident under these circumstances is not a "security" within the meaning of 15 U.S.C. § 78c(a)(10) by means of which § 10(b) may be applied to Connors and CIS. *See Singer v. Livoti*, 741 F.Supp. 1040, 1050 (S.D.N.Y.1990) (context of transaction showed that notes were not "securities" because they were intended as a temporary loan to solve cash flow problems and not as a permanent source of capital investment); *Equitable Life Assurance Soc'y v. Arthur Andersen & Co.*, 655 F.Supp. 1225, 1245 (S.D.N.Y.1987) (notes given in course of independently investigated, privately negotiated unique commercial financing transaction, where no secondary market was contemplated, were not "securities"). Partial summary judgment is granted in favor of defendants on Count 25 against Connors and Count 2 against CIS insofar as these counts assert losses from the BW Partners investments.[31]

## (b) Pleading Fraud with Particularity

■ Connors and CIS also seek summary judgment dismissing plaintiffs' § 10(b) claims in their entirety on the second grounds of failure to plead the alleged fraud with particularity. Allegations of fraud including securities fraud must specify the time, place and speaker, and content of the alleged fraudulent misrepresentations in order to comply with Rule 9(b) of the Federal Rules of Civil Procedure. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). In addition, Rule 9(b) requires that plaintiffs provide particular facts in the pleadings supporting each of the six elements of a § 10(b) violation. *See Breard v. Sachnoff & Weaver, Ltd.*, [1991] Fed.Sec.L.Rep. (CCH) ¶ 95,712, 1991 WL 3041 (S.D.N.Y. Jan. 9, 1991).[32]

■ Putting aside the question of whether plaintiffs have pled each of the six elements of a § 10(b) claim with the requisite particularity for each of the relevant in-

---

**31.** Plaintiffs have also failed to show that Robert Varnberg's interest in BW Partners should be deemed a "security" under the Act. A general partnership interest is generally not a "security" within the meaning of § 3(a)(10), *see Hirsch v. DuPont*, 553 F.2d 750, 753 n. 3 (2d Cir.1977), unless the partnership interest satisfies the test for an investment contract outlined in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The burden under that test is to show that "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104. However, a general partner undertakes, and is expected, to oversee and supervise the assets of the partnership pursuant to his fiduciary obligations to the other partners, *see In re Heafitz*, 85 B.R. 274, 284 (Bankr.S.D.N.Y.1988), and Robert Varnberg was undeniably involved with "Hot Laps" as well as the other ventures in which BW Partners invested albeit unsuccessfully. Pollack Aff., Exh. 9 at 207–09 (Robert Varnberg Dep.). Partial summary judgment as to the losses asserted from BW Partners is proper because no triable issues of fact exist regarding whether Robert Varnberg's general partnership interest in BW Partners was to derive profits solely through Minnick's endeavors. Defendants do not claim that Robert Varnberg functioned as a mere limited partner in BW Partners. *Cf. Clemente Global Growth Fund, Inc. v. Pickens*, 729 F.Supp. 1439, 1443–44 (S.D.N.Y.1990) (issue of whether general partner had, as a practical matter, status of a limited partner must await trial).

**32.** Those six elements are: (1) a misstatement or omission by the defendant, (2) as to a material fact, (3) relied upon by the plaintiff, (4) involving scienter on the part of the defendant, (5) made in connection with the purchase or sale of a security, and (6) causing damage to plaintiff. *Id.*

vestments,[33] the only portion of Count 25 against Connors and Count 2 against CIS alleging the misleading statements with the requisite particularity is the allegation in Count 2 against CIS charging it with issuing misleading quarterly valuation statements for the Varnberg portfolio. Third Amended Complaint ¶¶ 295–300, 302. *See* Pollack Aff., Exhs. 22–33, 35–43. Nowhere in their 78–page complaint or in the evidence presented do plaintiffs allege the time, place and content of any other allegedly misleading investment advice rendered by Connors or CIS.[34] Generalized and conclusory allegations that a defendant fraudulently concealed a breach of fiduciary duty in violation of § 10(b) do not satisfy the requirement of Rule 9(b). *See Armstrong v. McAlpin*, 699 F.2d 79, 90 (2d Cir.1983). Because plaintiffs have failed to plead facts showing any basis but the quarterly statements for their § 10(b) claim after amending their complaint a third time, *see Lowenbraun v. L.F. Rothschild, Unterberg, Towbin*, 685 F.Supp. 336, 341–42 (S.D.N.Y.1988),[35] summary judgment is granted as a matter of law dismissing Count 25 against Connors.[36] Partial summary judgment is granted in favor of CIS on Count 2 against it except insofar as the § 10(b) claim in Count 2 is based on quarterly valuation statements appearing in the record.

**33.** Relying upon *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 162–63 (S.D.N.Y.1990) defendants argue that the notations on the subscription agreements for Jasper Partners and Marifarm Shrimp preclude plaintiffs from establishing the element of reliance. If plaintiffs' § 10(b) claim as it relates to those two investments was pled with sufficient particularity—which it is not—plaintiffs' sophistication and reliance would be issues of fact.

**34.** At their respective depositions, plaintiffs could not recall the date or substance of the requests for advice they allege they made of Connors or of any of Connors' responses. *See* Pollack Aff., Exhs. 17 & 20 (Robert Varnberg Dep., Gail Varnberg Dep.).

**35.** *Cf. Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987).

**36.** The Court in its discretion opts to exercise subject matter jurisdiction over the remaining

### (c) Statute of Limitations

With respect to this remaining portion of plaintiffs' § 10(b) claim in Count 2 against CIS, CIS seeks summary judgment on statute of limitations grounds. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), does not contain an explicit statute of limitations for actions brought by private litigants. The Second Circuit recently held that the "one-year/three-year" limitations period provided in Sections 9(e) and 18(a) of the 1934 Act, rather than a state statute of limitations for common law fraud, applies to claims under Sections 10(b) and 14. *See Ceres Partners v. Gel Assocs.*, 918 F.2d 349 (2d Cir.1990). Under *Ceres*, plaintiffs must bring § 10(b) claims within one year of discovery of the conduct alleged to constitute the violation, but no more than three years after the occurrence of such conduct. *Id.* at 359, 361.[37]

The Second Circuit in *Ceres* left open the question of whether the one-year/three-year rule should be applied retroactively to actions filed before the date of the decision. *Id.* at 364. However, in *Welch v. Cadre Capital*, 923 F.2d 989 (2d Cir.1991), *rev'g Welch v. Cadre Capital*, 735 F.Supp. 467, 482–84 (D.Conn.1989), the Second Circuit reversed a decision by the lower court dismissing plaintiff's § 10(b) claims as untimely under the one-year/three-year statute of limitations. The lower court had held that

state law claims against Connors although plaintiffs' federal claims involving § 17(a), § 10(b) and RICO, have been dismissed as to Connors. The federal and nonfederal claims against Connors derive from a common nucleus of operative fact and factors of judicial economy, convenience and fairness to the litigants favor retaining jurisdiction over the state claims at this late stage in the litigation. *See Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (three-tiered analysis for exercise of pendent party jurisdiction).

**37.** Application of *Ceres Partners* leads to a different result in this case than if the six-year/two-year limitations period for fraud under New York state law were applied. The New York borrowing statute would not have been implicated since plaintiffs are New York residents and plaintiffs' claims accrued in New York. *See Appel v. Kidder, Peabody & Co.*, 628 F.Supp. 153, 156 (S.D.N.Y.1986) (claim "accrues" where economic loss is felt).

the equities tipped in favor of retroactive application of the one-year/three-year rule. The Second Circuit in *Welch* reached the opposite conclusion using the three-factor analysis announced in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).[38]

The Second Circuit in *Welch* held that the new one-year/three-year rule met the threshold requirement for prospectivity because it overruled clear past precedent and because prospective-only application of the new limitations period simultaneously advanced defendants' interests in repose and potential plaintiffs' interest through notice. *Welch*, 923 F.2d at 994, 995. These two findings are binding on this Court. However, applying the third *Chevron* factor, the Court finds that the equities in this action tip the balance in favor of applying *Ceres'* one-year/three-year rule retroactively to the Varnberg's § 10(b) claims.[39] Viewing the facts in the light most favorable to plaintiffs, retroactive application will not produce "substantial inequitable results." *Chevron Oil Co. v. Huson*, 404 U.S. at 107, 92 S.Ct. at 355. It seems clear that even if there was active concealment by the defendants, plaintiffs believed by 1980 or 1981, when BW Partners assigned

its partnership assets to Gail Varnberg for only $1000, and no later than by 1982 when Robert Varnberg hotly questioned Minnick on the investments, that there was a good probability that they had been defrauded.[40] Plaintiffs filed their claims against Connors and CIS on March 28, 1985. There is no basis in the record for inferring that the delay was in reliance on the six-year/two-year limitations period applicable to a § 10(b) claim at that time.[41] Furthermore the difficulty facing Connors and CIS in defending against claims of oral advice allegedly given to plaintiffs in 1977–1981 unsupported by any documentary evidence must be kept in mind.

■ The one-year prong of the "one-year/three-year" limitations period of *Ceres Partners* runs from the date upon which the plaintiff actually discovered or could, with reasonable diligence, have discovered the fraud, whichever is earlier. The test for the analogous rule under New York law is whether "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983). Where the circumstances suggest such a probabili-

---

**38.** Under *Chevron*, to qualify for prospective-only application, a court must find (1) that the new judicial rule "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed," 404 U.S. at 106, 92 S.Ct. at 355; (2) considering the prior history, purpose and effect of the rule, that it would further the operation of the rule to apply it only prospectively, *id.* at 106–07, 92 S.Ct. at 355–56; and (3) that retroactive application would produce substantial inequitable results. *Id.* at 107, 92 S.Ct. at 355.

**39.** The Second Circuit in *Welch v. Cadre Capital* was careful to note that:

[T]he first [*Chevron*] factor is mandatory.... If the proponent of nonretroactivity clears the first hurdle, the court then proceeds to the "balancing process demanded by the second and third factors."

*Welch*, 923 F.2d at 994 (citations omitted).

**40.** Gail Varnberg testified at her deposition that as early as 1978 she realized that "none of [Minnick's ventures] were spanning [sic] out" and that "at that point I had decided to halt Mr.

Minnick as best I could." Pollack Aff., Exh. 5 at 204–05. In her own words, Gail Varnberg "wanted to see some monies coming back from Mr. Minnick" as early as 1978. *Id.* Robert Varnberg testified that in 1982 he "accuse[d] [Minnick] of not performing what he said he would do" and that he had asked Minnick in 1982 "what was going on and what happened and why we hadn't made money...." *Id.*, Exh. 6 at 57 (Robert Varnberg Aff.) *See also* Pollack Aff., Exh. 15 at 211–12 (Gail Varnberg Dep.).

Plaintiffs' argument that in 1982 they lacked the necessary records to draw any meaningful conclusions about their investments and that they lacked an understanding of what was happening until 1983 when William Evers began assisting them in investigating their investments is not credible given the deposition testimony. They commenced this action involving the same investments against the other defendants in mid–1983 and waited two years to join Connors and CIS who allegedly acted in a fiduciary capacity in advising them on the Minnick investments.

**41.** *See Hoff Research & Dev. Laboratories, Inc. v. Philippine Nat'l Bank*, 426 F.2d 1023, 1026 (2d Cir.1970).

ty, a duty of inquiry arises and if no inquiry is made, knowledge of the fraud will be imputed. *Id.* As the Second Circuit has admonished, "commencement of the statutory period [of limitations] does not await a plaintiff's 'leisurely discovery of the full details of the alleged scheme.'" *Phillips v. Levie,* 593 F.2d 459, 462 (2d Cir.1979) (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970)).

Having carefully reviewed the quarterly statements at issue, and viewing the facts in a light most favorable to plaintiffs, this Court cannot pinpoint as a matter of law any point at which the circumstances should have suggested to plaintiffs the possibility that the quarterly statements, most of which are optimistic in tone, may have been fraudulent. The uncontroverted figures in paragraphs 9 and 11 of defendants' Rule 3(g) statement show that plaintiffs' portfolio actually increased in value by nearly $3 million under CIS's management. *See Farley v. Baird, Patrick & Co.,* 750 F.Supp. 1209 (S.D.N.Y.1990) (district court could not find as a matter of law that plaintiff had a duty to suspect that his brokers were charging unreasonable prices for stocks they recommended).

Under these circumstances, the Court has no choice but to apply the three-year prong of *Ceres Partners'* "one-year/three-year" limitations period which begins to run when the fraudulent conduct—in this case the issuance of each allegedly misleading quarterly statement—occurred.[42] Because the Second Amended Complaint naming CIS as a defendant was filed on March 28, 1985, the plaintiffs' claims in Count 2 against CIS based on the sixteen quarterly valuation statements issued prior to March 28, 1982 are untimely.[43] Accordingly, partial summary judgment is granted in favor of CIS as a matter of law insofar as Count

2 against it asserts § 10(b) violations based on the sixteen quarterly statements issued prior to March 28, 1982. The five statements issued thereafter raise triable issues of fact and partial summary judgment is not granted on statute of limitations grounds as to them. Thus Count 2 against CIS—insofar as it rests on the five quarterly valuation statements issued after March 28, 1982—survives defendants' motion on statute of limitations grounds and, having survived defendants' two other challenges, remains a valid basis for federal jurisdiction over CIS under the securities laws.

### (b) *RICO*

Plaintiffs' RICO claim is asserted against all defendants. Apart from realleging certain prior paragraphs, the Third Amended Complaint states the entire substance of plaintiffs' RICO claim as follows:

324. Upon information and belief, the defendants have engaged in the fraudulent sale of securities and "racketeering activity" as that term is employed in 18 U.S.C. § 1961 and have been involved in a "pattern of racketeering activity". A pattern exists in that the defendants have been engaged, since as early as 1978 and continuing thereafter until at least 1982, in interstate enterprises consisting of fraudulent transactions involving securities and other forms of property, setting up of various business entities, systematically draining the assets of such entities and thereby causing substantial losses to plaintiffs. The U.S. mails have been used by these defendants to accomplish the foregoing. The defendants have used and invested income acquired from the fraudulent sales in the acquisition of interests in business entities engaged in interstate commerce.

---

**42.** Application of the three-year rather than the one-year limitations period slightly favors plaintiffs on this motion for summary judgment against them. *See supra* note 40 and accompanying text.

**43.** Those sixteen quarterly statements are Exhibits 22–33 and 35–38 appended to the moving affidavit of Alan M. Pollack. Each quarterly statement except Exhibit 27 has a cover letter

from CIS signed by Connors. The cover letters are dated at least one but no more than two months after the last day of each quarter. It is irrelevant which date is used for statute of limitations purposes since the statement immediately preceding the cut-off date of March 28, 1982 has a cover letter dated February 19, 1982 and evaluates the quarter ending December 31, 1981.

325. By reason of the foregoing, defendants have violated § 901(a) of the Racketeer Influenced and Corrupt Organizations Act.

Third Amended Complaint ¶¶ 324–25.

The elements of a RICO claim are "(1) that the defendant (2) through the commission of two or more [predicate] acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976)." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). *See also Morin v. Trupin*, 711 F.Supp. 97, 104 (S.D.N.Y.1989) (quoting *Moss*). These elements must be pleaded with particularity where the RICO claim alleges predicate acts involving fraud. *See Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 348 (S.D.N.Y.1986). Dismissal of a RICO claim is warranted where the pleadings merely repeat the words of the statute in a conclusory and general fashion. *See D'Addio v. L.F. Rothschild Inc.*, 697 F.Supp. 698, 705–06 (S.D.N.Y.1988).

Plaintiffs have failed to plead either their RICO claim or the predicate acts of securities fraud with any particularity.[44] Allegations of securities fraud involving material misrepresentations are generally insufficient where pleaded "upon information and belief," *see Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir.1986), and where the time, place and content of defendants' statements are not specified. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Similarly, plaintiffs have failed to identify the RICO "enterprises" or to plead facts showing its involvement in interstate commerce. Accordingly, summary judgment is granted as a matter of law dismissing plaintiffs' RICO claim with prejudice.

**44.** Plaintiffs state that transactions in violation of RICO were accomplished through use of the mails but they have failed to plead mail fraud as

## 2. The State Claims

### (a) *Aiding and Abetting Claims against Connors*

Plaintiffs limit their aiding and abetting claims to defendant Connors, charging that he aided and abetted the securities fraud violations committed by Minnick, Hayes and Oppenheimer. The elements of an aiding and abetting claim are: (1) existence of a violation by the primary party; (2) knowledge of the violation on the part of the accused aider and abettor; and (3) substantial assistance by the alleged aider and abettor in accomplishing the underlying violations. *See ITT, an Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980). Under Rule 9(b), each of the three elements must be pleaded with particularity when the claim involves aiding and abetting fraud. *See O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 229 n. 10 (S.D.N.Y.1989).

Pleading deficiencies in this action with respect to the first element, existence of securities fraud violations by the primary parties, are significant. Plaintiffs have failed to specify the time, place or content of nearly every alleged misrepresentations by Minnick, Hayes and Oppenheimer constituting the underlying § 10(b) violations. Rather, plaintiffs have merely alleged that Minnick and Oppenheimer variously represented that individual ventures would "make a lot of money" (Third Amended Complaint ¶ 45) (BW Partners), would be profitable enterprises (¶ 113) (Jasper Partners) and (¶ 188) (Marifarms Shrimp) or would be low risk investments with a high probability of substantial return (¶ 131) (Annetta Partners) and (¶ 168) (Texas Partners). *See also* Pollack Aff., Exh. 9 at 203, 206–07 (Robert Varnberg Dep.). Plaintiffs also allege that Minnick represented that there was a high probability that he would be able to obtain other investors in the ventures in which BW Partners invested and that he would take the necessary steps to make those ventures profitable. The pleading requirements of

a separate predicate act or provide any evidence demonstrating the elements of a claim for mail fraud.

Rule 9(b) not complied with in this action take on added importance because courts are unwilling to recognize a defendant's puffery as material misstatements giving rise to liability under the securities laws. *See Cohen v. Prudential–Bache Sec., Inc.,* 713 F.Supp. 653, 658 (S.D.N.Y.1989); *Bowman v. Hartig,* 334 F.Supp. 1323, 1328 (S.D.N.Y.1971).[45]

■■■ Plaintiffs have similarly failed to plead the scienter element of their aiding and abetting claims against Connors with particularity. Recklessness will satisfy the scienter requirement for aiding and abetting securities fraud where fiduciary duties are involved in the underlying transactions. *See ITT, an Int'l Inv. Trust v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980); *Epstein v. Haas Sec. Corp.,* 731 F.Supp. 1166, 1176 (S.D.N.Y.1990). Plaintiffs merely allege that Connors was "asked to investigate" the various investments and either failed to do so or, due to an alleged relationship with the primary violators, failed to disclose the findings of his investigations. *See, e.g.,* Third Amended Complaint ¶ 93; Gail Varnberg Aff. ¶ 11. Although this action was filed in 1983, plaintiffs fail to supply any factual details indicating the time, place or context in which their requests were made or Connors' response thereto. Plaintiffs offer no factual grounds for inferring that some sort of secret arrangement existed between Connors, Minnick, Hayes and Oppenheimer to conceal the alleged fraud. Plaintiffs merely infer the existence of such a relationship by alleging that Connors was rendering advice to Minnick's mother and by alleging that Connors was helping Minnick, Hayes and Oppenheimer put together investment "deals." Third Amended Complaint ¶ 31. By failing to offer supporting facts, plaintiffs have failed to show evidence of scienter on Connors' part with the particularity required by Rule 9(b). Simply establishing a party's expertise is not in itself enough to show

recklessness without additional facts that show that defendant acted with scienter. *Breard v. Sachnoff & Weaver, Ltd.,* [1991] Fed.Sec.L.Rep. (CCH) ¶ 95,712 (S.D.N.Y. Jan. 9, 1991).

■■■ Finally, plaintiffs have failed to plead with particularity the third element of an aiding and abetting claim, substantial assistance. Where the type of assistance alleged is silence or inaction, aider and abettor liability will attach only (1) where there is "a conscious or reckless violation of an independent duty to act" such as where a fiduciary relationship exists, *ITT, an Int'l Inv. Trust v. Cornfeld,* 619 F.2d at 927, or (2) where the alleged aider and abettor had "a conscious and specific motivation for not acting." *Id. See also Thornock v. Kinderhill Corp.,* 749 F.Supp. 513, 517 (S.D.N.Y.1990). Plaintiffs' counsel specified at oral argument that plaintiffs were relying on the first theory of substantial assistance. Although plaintiffs have alleged that the oral and written agreements retaining Connors as their investment advisor created an independent duty to act, the evidence presented includes only the vague allegations in the pleadings which are factually insufficient to show that Connors' alleged violation of duty was either conscious or reckless.[46]

Accordingly, summary judgment dismissing plaintiffs' aiding and abetting claims against Connors in Counts 1, 4, 7, 10, 13, 20 and 21 is granted as a matter of law. *Cf. National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199 (2d Cir.1989) (affirming dismissal of aiding and abetting claim where claimant failed to raise a genuine issue of material fact concerning aider and abettor's participation in the primary fraud or its alleged fiduciary duty).

(b) *Breach of Investment Management Agreement Claim*

■■■ Count 24 against Connors and Count 1 against CIS charge them with

---

**45.** The only claim alleging the content of defendants' misrepresentations with any degree of particularity is that against Oppenheimer regarding New Haven Acquirers. Third Amended Complaint ¶ 271, 283. Plaintiffs have failed, however, to plead the time or place Oppenheimer allegedly made the statements.

**46.** In fact, Robert Varnberg testified at his deposition that he did not believe that Connors did anything to assist Minnick in return for some form of payment. Pollack Aff., Exh. 16 at 282–83 (Robert Varnberg Dep.).

332

breach of the 1977 Investment Management Agreement and Gail Varnberg's oral and written agreements by *inter alia* advising plaintiffs to invest in many risky ventures without disclosing the risks. Although the Third Amended Complaint is not explicit, the risky ventures were apparently the investments identified by Minnick, Hayes and Oppenheimer beginning with Jasper Partners in 1977.

Connors denies that he personally had any agreement giving rise to liability prior to 1979. Although the Court rejects plaintiffs' reading of the letter agreement dated June 28, 1979 to give it retroactive effect, *see* Gail Varnberg Aff. ¶ 15 and Exh. D, issues of fact exist as to whether some type of agreement existed between plaintiffs and Connors regarding his role as an individual manager of plaintiffs' investments apart from his duties under CIS's 1977 Investment Management Agreement with the Varnbergs. Gail Varnberg Aff. ¶ 16; Robert Varnberg Aff. ¶ 7. Issues of fact also exist as to the duties CIS assumed and/or performed after the Investment Management Agreement was signed. Accordingly, summary judgment on Count 24 against Connors and Count 1 against CIS is denied.

### (c) *Breaches of Contract Claims against Connors*

Although there are no breach of contract claims against CIS in this action, plaintiffs advance numerous claims for breach of contract against Connors (Counts 2, 5, 8, 11, 14 and 16) for failing to advise plaintiffs of the risks involved in each of their various investments.

■ Connors seeks to dismiss plaintiffs' breach of contract claims involving Jasper Partners, Annetta Partners, Texas Partners and Marifarms Shrimp (Counts 5, 8, 11 and 14) on statute of limitations grounds. New York law provides for a six-year statute of limitations for breach of contract actions. N.Y.Civ.Prac. L. & R. § 213(2) (McKinney 1990). If defendants committed any breach of contract by failing to advise plaintiffs of the potential risks involved in a proposed investment, such breach must

have occurred no later than the date upon which plaintiffs first made the investment. Subsequent investments in the same entity necessarily relate back to the initial decision to invest. Thus any contract claims based on investments commenced prior to March 28, 1979 are untimely. Plaintiffs admit that:

> The investments in which the Varnbergs became involved through Minnick, including ... the amount and date when they first invested are listed below:
>
> . . . . .
>
> B. *Jasper Partners '77* (oil and gas tax shelter)—$200,000; November 30, 1977.
> C. *Annetta Partners* (loan and guaranty)—$628,000; May or June 1978.
> D. *Texas Partners '78* (oil and gas tax shelter investment made by Gailswell Corporation, plaintiffs' Subchapter S corporation)—$75,000; October, 1978.
> E. *Marifarms Shrimp* (tax shelter)—$56,250; 1978.

Def. Rule 3(g) Stmt. ¶ 13; Pl. Rule 3(g) Stmt. ¶ 13. Accordingly, summary judgment is granted as a matter of law in favor of Connors on Counts 5, 8, 11 and 14.

Similarly, it is uncontroverted that Gail Varnberg's loans to BW Partners for use in connection with Rosa Company, Hot Laps and Ample Christian Endeavor (totalling $266,000) occurred prior to March 28, 1979. Def. Rule 3(g) Stmt. ¶ 13; Pl. Rule 3(g) Stmt. ¶ 13. Accordingly, partial summary judgment on Count 2 against Connors is granted in favor of Connors as a matter of law.

Summary judgment is denied on Count 16 against Connors. Triable issues of fact exist as to the date of plaintiffs' investment in D–M Partners and/or Aiand International.

### (d) *Breach of Fiduciary Duty Claims against Connors*

■ Like the breach of contract claims, plaintiffs' breach of fiduciary duty claims are brought solely against Connors individually (Counts 3, 6, 9, 12, 15, 17, 19, 23 and 26). Plaintiffs claim that Connors breached a fiduciary duty which he had assumed

toward plaintiffs by failing to apprise them of the substantial risks involved in their various investments. Although it is not at all clear in the complaint, the fiduciary duty apparently arose in connection with the alleged oral investment agreement between Connors and Gail Varnberg dating back to November 1977.

Under New York law, both a three-year and a six-year statute of limitations have been held to apply to claims of breach of fiduciary duty. *Compare Loengard v. Santa Fe Indus., Inc.*, 573 F.Supp. 1355, 1360 (S.D.N.Y.1983) (action by shareholders after short-form merger closer to injury to property action governed by three-year limitations period of C.P.L.R. § 214(4) than to equity action) *with Croce v. Kurnit*, 565 F.Supp. 884, 891 (S.D.N.Y.1982) (action for breach of recording contracts closer to action for fraud governed by six-year statute of limitations), *aff'd on other grounds*, 737 F.2d 229 (2d Cir.1984).[47] In choosing between the two possible periods of limitations, a court should consider the gravamen of the complaint. *See Cohen v. Goodfriend*, 665 F.Supp. 152, 159 (E.D.N.Y. 1987). In this case, plaintiffs claim that Connors breached a fiduciary duty he owed to plaintiffs by aiding and abetting the securities fraud allegedly committed by the other defendants. Plaintiffs' breach of fiduciary duty claim is thus closer to a claim sounding in contract or fraud, each with a six-year statute of limitations, *id.* at 160, than to a claim for injury to property.

Under the same reasoning set forth in the preceding section, plaintiffs' claims for breach of fiduciary duty arising out of investments made prior to March 28, 1979 are time-barred because the alleged breach must have occurred prior to the making of each investment. Plaintiffs admit in their response to paragraph 13 of defendants' Rule 3(g) statement, and Minnick's deposition testimony confirms, that loans and advances to BW Partners for Rosa Company, Hot Laps and Ample Christian Endeavor, as well as the investments in Jasper Partners, Annetta Partners, Texas Partners and Marifarms Shrimp occurred prior to March 28, 1979. Accordingly, partial summary judgment is granted as a matter of law in favor of Connors on Count 3 against him. On the same rationale, summary judgment is granted dismissing Counts 6, 9, 12 and 15 against Connors in their entirety.

Count 26 against Connors (Third Amended Complaint ¶¶ 305–07) is an omnibus claim for breach of fiduciary duty resting on the facts alleged in support of plaintiffs' claims against Connors and CIS for breach of agreement. The Court strikes this Count *sua sponte* pursuant to Rule 12(f) of the Federal Rules of Civil Procedure as redundant of plaintiffs' other claims.

Summary judgment on statute of limitations grounds is denied on Counts 19 and 23 against Connors because the investments were admittedly made in 1980 and 1981 and on Count 17 since the date of plaintiffs' investment in D–M Partners is an issue of fact.

### (e) *Unjust Enrichment Claims*

Plaintiffs have brought claims against Connors (Count 27) and CIS (Count 3) for unjust enrichment for fees paid by plaintiffs under the 1977 and 1979 investment management agreements. Under New York law, claims of unjust enrichment are governed by a six-year statute of limitations. *See Natimir Restaurant Supply Ltd. v. London 62 Co.*, 140 A.D.2d 261, 528 N.Y.S.2d 564 (1988). Thus any claim to

---

**47.** Plaintiffs urge the Court to apply the continuous treatment doctrine to toll the statute of limitations on their breach of fiduciary duty claims against Connors. It would be inappropriate to do so because these claims do not rise to a claim of professional malpractice. *Cf. Greene v. Greene*, 56 N.Y.2d 86, 451 N.Y.S.2d 46, 436 N.E.2d 496 (1982) (legal malpractice); *Borgia v. City of New York*, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962) (medical malpractice); *Board of Educ. v. Thompson Constr. Corp.*, 111 A.D.2d 497, 488 N.Y.S.2d 880 (1985) (architects). *But see Ben Heller, Inc. v. St. Paul Fire & Marine Ins. Co.*, 107 Misc.2d 687, 435 N.Y.S.2d 669 (N.Y.Sup.Ct.1981) (licensed insurance brokers). Cases applying the toll for continuous treatment necessarily involve losses not apparent to the plaintiff until well after the injury occurs. The evidence in this case shows that Gail Varnberg knew as early as 1978 that "none of [Minnick's projects] were spanning [sic] out." Pollack Aff., Exh. 5 at 204.

recover fees paid to Connors or CIS prior to March 28, 1979 is time-barred. Accordingly, partial summary judgment is granted as a matter of law in favor of Connors on Count 27 and in favor of CIS on Count 3 as to any fees paid prior to March 28, 1979.

## CONCLUSION

Summary judgment is granted as a matter of law in favor of Connors on Counts 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 20, 21, 25 and 28 against him and in favor of CIS on Count 4 against it. Partial summary judgment is granted as a matter of law in favor of Connors on Counts 2, 3 and 27 against him and in favor of CIS on Counts 2 and 3 against it. Summary judgment is denied on Counts 16, 17, 19, 23 and 24 against Connors and on Count 1 against CIS. Finally, Count 26 against Connors is stricken by the Court from the Third Amended Complaint.[48]

IT IS SO ORDERED.

**48.** Thus, of the claims challenged by this motion, Counts 2, 3, 16, 17, 19, 23, 24 and 27 against Connors and Counts 1–3 against CIS remain, either in full or in part, as noted throughout the opinion.